**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: ARTHUR DANIEL MONROY;
LAURA MONROY,

　　　　　　　　　*Debtors,*

────────────────────

HOME FUNDS DIRECT, its assignees
and/or successors in interest,

　　　　　　　　　*Appellant,*

　　　　v.

ARTHUR DANIEL MONROY; LAURA
MONROY,

　　　　　　　　　*Appellees.*

No. 10-60005

BAP No.
09-1175-PaHD

In re: CHRISTINE PAULETTE HANNON,
　　　　　　　　　*Debtor,*

────────────────────

U.S. BANK, N.A.,

　　　　　　　　　*Appellant,*

　　　　v.

CHRISTINE PAULETTE HANNON;
ELIZABETH ROJAS, Chapter 13
Trustee,

　　　　　　　　　*Appellees.*

No. 10-60017

BAP No.
09-1184

8271

In re: ANTHONY JOHN HERRERA, JR.;
MARY ELLEN HERRERA,

*Debtors,*

GREENPOINT MORTGAGE FUNDING,
INC.,

*Appellant,*

v.

ANTHONY JOHN HERRERA, JR.;
MARY ELLEN HERRERA; ELIZABETH
F. ROJAS,

*Appellees.*

No. 10-60018

BAP No.
09-1155

ORDER

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Hollowell, Pappas, and Dunn, Bankruptcy Judges, Presiding

Argued and Submitted
June 10, 2011—Pasadena, California

Filed June 20, 2011

Before: Stephen S. Trott and Pamela Ann Rymer, Circuit
Judges, and Stephen M. McNamee, Senior District Judge.*

**COUNSEL**

Lee S. Raphael, Prober & Raphael, Woodland Hills, California, for the appellants.

*The Honorable Stephen M. McNamee, Senior District Judge for the
U.S. District Court for Arizona, sitting by designation.

M. Erik Clark, Borowitz & Clark, LLP, West Covina, California, for the appellees.

## ORDER

The decisions of the Bankruptcy Courts are affirmed for the reasons given by the Bankruptcy Appellate Panel in its published opinion in *In re Herrera*, 422 B.R. 698 (B.A.P. 9th Cir. 2010), filed January 5, 2010 and attached as an appendix to this order.[1]

---

[1] The remand issue raised by the appellants before this court is waived because it was not raised below. *In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1045 n.3 (9th Cir. 2001).

**APPENDIX**

Case: 09-1175  Document: 009137956  Filed: 01/15/2010  Page: 1 of 43

FILED

JAN 05 2010

ORDERED PUBLISHED

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos. CC-09-1155-PaHD |
| | CC-09-1162-PaHD |
| ANTHONY JOHN HERRERA and | CC-09-1184-PaHD |
| MARY ELLEN HERRERA, | CC-09-1175 PaHD |
| | (jointly briefed) |
| Debtors. | |
| | Bk. Nos. SV 08-13212-KT |
| | SV 08-14725-GM |
| In re: | SV 09-11330-MT |
| | LA 09-11321-VK |
| NORMAN LEFF and ROSITA BLONES LEFF, | |
| | O P I N I O N |
| Debtors. | |
| | |
| In re: | |
| | |
| CHRISTINE PAULETTE HANNON, | |
| | |
| Debtor. | |
| | |
| In re: | |
| | |
| ARTHUR DANIEL MONROY and | |
| LAURA MONROY, | |
| | |
| Debtors. | |
| | |
| GREENPOINT MORTGAGE FUNDING, INC., | |
| | |
| Appellant, | |
| | |
| v. | |
| | |
| ANTHONY JOHN HERRERA and | |
| MARY ELLEN HERRERA, | |
| | |
| Appellees. | |

DEUTSCHE BANK, NATIONAL TRUST CO., )
AS TRUSTEE FOR FIRST FRANKLIN        )
MORTGAGE LOAN TRUST 2006-FF5,        )
MORTGAGE PASS-THROUGH CERTIFICATES,)
SERIES 2006-FF5,                     )
                                     )
                  Appellant,         )
                                     )
v.                                   )
                                     )
NORMAN LEFF and ROSITA BLONES LEFF,)
                                     )
                  Appellees.         )
_____)
                                     )
U.S. BANK, N.A.,                     )
                                     )
                  Appellant,         )
                                     )
v.                                   )
                                     )
CHRISTINE PAULETTE HANNON,           )
                                     )
                  Appellee.          )
_____)
                                     )
HOME FUNDS DIRECT,                   )
                                     )
                  Appellant,         )
                                     )
v.                                   )
                                     )
ARTHUR DANIEL MONROY and             )
LAURA MONROY,                        )
                                     )
                  Appellees.         )
_____)

Argued and submitted on November 19, 2009
            at Pasadena, California

            Filed - January 5, 2010

    Appeals from the United States Bankruptcy Court
        for the Central District of California

The Honorable Kathleen Thompson, Geraldine Mund, Maureen Tighe and
   Victoria Kaufman, United States Bankruptcy Judges, Presiding

_____

Before: PAPPAS, HOLLOWELL and DUNN, Bankruptcy Judges.

PAPPAS, Bankruptcy Judge:

In each of these four appeals, the creditor holding the mortgage on the debtors' primary residence challenges the order of the bankruptcy court confirming the chapter 13[1] debt-repayment plan. In each case, the debtors incorporated in the plan several provisions taken from a form of optional provisions adopted by the bankruptcy judges of the Central District of California. The mortgage creditors presented common objections to those provisions, and continue those objections in these four appeals. Because the facts in each case are undisputed, and common legal issues are raised, we ordered that the appeals be jointly briefed and argued. This decision disposes of all four appeals. We AFFIRM the bankruptcy courts' plan confirmation orders.

**FACTS**

We begin with a brief sketch of the relevant, undisputed facts and the procedural history of these four bankruptcy cases.

**Herreras', Leffs' and Hannon's Bankruptcy Cases**

Anthony John Herrera and Mary Ellen Herrera ("Herreras")[2] filed a chapter 13 petition on May 16, 2008, and a First Amended Plan on July 8, 2008. The First Amended Plan provided that Herreras would directly pay the secured creditor, Greenpoint Savings ("Greenpoint"), all post-petition monthly payments on the

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2] BAP No. CC-09-1155 (Bankr. SV-08-13212-KT, Judge Kathleen Thompson, presiding).

mortgage held by Greenpoint on their residence.  They proposed to cure the $20,982.62 in mortgage arrearages they alleged they owed on the date of bankruptcy by making payments "through the plan" to the chapter 13 trustee for distribution to Greenpoint.

On July 9, 2008, Norman Leff and Rosita Blones Leff ("Leffs")[3] filed their chapter 13 petition and proposed plan.  The plan provided that Leffs would directly pay Deutsche Bank National Trust Co. ("Deutsche Bank") post-petition monthly mortgage payments on their residence, and would cure $23,555.00 in prepetition mortgage arrearages through the plan.

On February 6, 2009, Christine Paulette Hannon ("Hannon")[4] filed her chapter 13 petition and proposed plan.  Hannon proposed to directly pay U.S. Bank Home Mortgage ("U.S. Bank") post-petition monthly mortgage payments on her residence, and to cure $19,100.00 in prepetition mortgage arrearages through the plan.

Herreras, Leffs and Hannon each incorporated in their proposed plans an addendum known as "Local Form F 3015-1.1A" (the "Addendum").  The Addendum is a collection of chapter 13 plan provisions set forth in an optional form that had been approved by the bankruptcy judges of the Central District of California for use by debtors in chapter 13 cases who propose to repay debt secured by a mortgage on their residential real property, or by a lien on personal property the debtor occupies as the debtor's

---

[3]  BAP No. CC-09-1162 (Bankr. SV-08-14725-GM, Judge Geraldine Mund, presiding).

[4]  BAP No. CC-09-1184 (Bankr. SV-09-11330-MT, Judge Maureen Tighe, presiding).

-4-

principal residence. The terms of the Addendum impose certain reporting and other obligations on the mortgage creditor during the term of the chapter 13 plan. More details concerning the Addendum are presented below.

Greenpoint objected to the First Amended Plan in Herreras' case, Deutsche Bank objected to the plan in Leffs' case, and U.S. Bank objected to the plan in Hannon's case. Although there were slight variations in the arguments in the separate cases, the mortgage creditors generally targeted the Addendum, arguing that its terms imposing post-confirmation reporting and other duties were inconsistent with the mortgage creditors' contractual rights, violated federal law, and constituted an undue administrative burden. The debtors in each case disputed the mortgage creditors' positions. The parties filed additional pleadings in each case regarding their positions on the Addendum.

On April 28, 2009, the presiding judges in the Herreras, Leff, and Hannon bankruptcy cases issued a Joint Memorandum of Opinion (the "Joint Memorandum"), together with an order implementing the Joint Memorandum, addressing the inclusion of the Addendum in the debtors' chapter 13 bankruptcy plans, and the mortgage creditors' objections to those plans. The Joint Memorandum generally overruled the creditors' objections,[5] except for the objection to one provision of the Addendum (known as "subsection A7"), a requirement that mortgage creditors provide advance notice to debtors before filing a motion for relief from stay. The Joint Memorandum concluded that this term was

---

[5] There were also several challenges to non-Addendum provisions in the plans but they have not been appealed.

inconsistent with the provisions of § 362(d).  The Joint Memorandum directed the debtors in each case to file amended plans deleting subsection A7 of the Addendum.

Even though the Joint Memorandum did not purport to confirm the debtors' plans,[6] on May 8, 2009, the mortgage creditors each filed a notice of appeal in the respective bankruptcy cases from the "Order Confirming Chapter 13 plan entered on April 28, 2009."[7]

As directed by the Joint Memorandum, Herreras, Leffs and Hannon each filed amended plans generally consistent with their original plans, but deleting subsection A7 of the Addendum.  There were no hearings on plan confirmation.  Herreras' amended plan was confirmed in an order entered May 20, 2009; Leffs' amended plan was confirmed in an order entered May 13, 2009; and Hannon's amended plan was confirmed in an order entered July 22, 2009.

On May 27, 2009, Greenpoint, Deutsche Bank and U.S. Bank filed amended notices of appeal, again designating the Joint Memorandum as the order on appeal in the three cases, instead of the confirmation order.

### The Monroys' Case[8]

The bankruptcy judge in Monroys' case did not participate in the Joint Memorandum.  However, the court came to similar

---

[6] Read liberally, nothing in either the Joint Memorandum or the accompanying order can be construed to confirm the plans.

[7] Of course, no plan confirmation order was entered on April 28, only the order implementing the Joint Memorandum.  Issues relating to the filing of the notices of appeal in the Herrera, Leff, and Hannon appeals are addressed in our Jurisdiction statement below.

[8] BAP No. CC-09-1175 (Bankr. LA-09-11321-VK, Judge Victoria Kaufman, presiding).

-6-

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 7 of 43

conclusions and rulings.

On January 22, 2009, Arthur Daniel Monroy and Laura Monroy ("Monroys") filed their chapter 13 petition and plan. The plan provided that Monroys would directly pay the mortgage creditor Home Funds Direct ("HFD") post-petition monthly mortgage payments, and would cure $454.08 in prepetition mortgage arrearages through the plan. Monroys' plan incorporated the Addendum. HFD objected to the plan, challenging the Addendum.

The bankruptcy court conducted a confirmation hearing on March 18, 2009. At the conclusion of the hearing, the bankruptcy judge ruled on the record that "the Court agrees with the majority of courts as far as the notification provisions in [the Addendum] that those are procedural mechanisms that are consistent with the provisions of Chapter 13 and the Bankruptcy Code as a whole." Hr'g Tr. 8:12-17 (March 18, 2009). The court, however, did rule that subsection A7 impermissibly conflicted with § 362 and ordered that provision be stricken from the plan.

As permitted by the bankruptcy court's decision, Monroys submitted an amended plan on March 20, 2009, without subsection A7. Ruling on the record at the May 6 continued hearing on plan confirmation, the bankruptcy court confirmed the amended plan. The court entered its order confirming the amended plan on May 18, 2009.

HFD filed a timely notice of appeal of the confirmation order on May 21, 2009.

### The Addendum

According to the chair of the ad hoc committee of Central District of California bankruptcy judges that apparently crafted

-7-

the Addendum,[9] it was designed and adopted in response to two needs: overcoming the reluctance of secured creditors to communicate with debtors in chapter 13, and preventing a secured creditor from assessing additional fees and costs against the debtor at the conclusion of the bankruptcy case that had not been communicated to the debtor or approved by the bankruptcy court. The committee originally proposed adoption of a general order by the bankruptcy court that would require that provisions such as those ultimately incorporated in the Addendum be included in all chapter 13 plans. However, this proposal was rejected by the district's board of judges, which preferred that such decisions be made in each bankruptcy case, and not imposed on chapter 13 debtors by a general order. As a result, the committee ultimately proposed a non-binding, optional form, the Addendum, the propriety of which could be adjudicated on a case-by-case basis.

The Addendum was approved by majority vote of the bankruptcy judges of the Central District of California, and the judges' decision was implemented via "Local Form 3015-1.1A." The Addendum provisions incorporated in each of the four confirmed plans and implicated in these appeals read as follows:[10]

---

[9] This information is taken from comments made by the chairperson of the ad hoc committee, the Honorable Meredith Jury, in connection with proceedings in another chapter 13 case, In re Bracks, Case No. RS-08-16954 (Bankr. C.D. Cal., August 4, 2008); Hr'g Tr. 3:22—6:5. A transcript of these comments was submitted by the appellees in these appeals, and the mortgage creditors did not object to its inclusion as part of the record in these appeals. We also note that the Joint Memorandum cites the In re Bracks decision.

[10] Other subsections of the Addendum, A1, B1 and B2, were also included in the debtors' plans, but have not been challenged by the mortgage creditors in these appeals. Subsection A3, dealing with cases where current monthly payments are to be made
(continued...)

-8-

A2. Except as provided in paragraphs (3) and (4) below, if the Mortgage Creditor provided monthly statements to the debtor pre-petition, the Mortgage creditor must provide monthly statements to the debtor. The monthly statements must contain at least the following information concerning post-petition payments to be made outside the Plan: (a) The date of the statement and the date of the next payment due; (b) The amount of the current monthly payment; (c) The portion of the payment attributable to escrow, if any; (d) The post-petition amount past due, if any, and from what date; (e) Any outstanding late charges; (f) The amount and date of receipt of all payments received since the date of the last statement; (g) A telephone number and contact information that the debtor or the debtor's attorney may use to obtain reasonably prompt information regarding the loan and recent transactions; and (h) The proper payment address.

A4. If, pre-petition, the Mortgage Creditor provided the debtor with "coupon books" or some other preprinted, bundled evidence of payments due, the Mortgage Creditor is not required to provide monthly statements under subsection (2) of this section. However, the Mortgage Creditor must supply the debtor with additional coupon books as needed or requested in writing by the debtor. If a Mortgage Creditor does send a monthly statement to the debtor or the chapter 13 trustee and the statement complies with subsection (B)(2) below, the Mortgage Creditor is entitled to the protections set out in such subsection.

A5. The Mortgage Creditor must provide the following information to the debtor upon reasonable written request of the debtor: (a) The principal balance of the loan; (b) The original maturity date; (c) The current interest rate; (d) The current escrow balance, if any; (e) the interest paid to date; and (f) The property taxes paid year to date, if any.

A6. The Mortgage Creditor must provide the following information to the debtor, the debtor's attorney and, when the debtor is making ongoing mortgage or arrearage payments through the chapter 13 trustee, the chapter 13 trustee, at least quarterly, and upon reasonable written request of the debtor or the chapter 13 trustee: (a) any

---

[10](...continued) by the trustee "through the plan," is not listed among the issues designated in the creditors' brief, or specifically argued in this appeal, although this provision is occasionally listed in the creditors' brief along with the other provisions that creditors find objectionable. We express no opinion concerning the propriety of any of these other Addendum provisions. We discuss subsection A7 in n.11, <u>infra</u>.

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 10 of 43

other amounts due or proposed change in payments arising from an adjustable interest rate, charges paid by the Mortgage Creditor for taxes, insurance, attorney's fees or any other expenses or fees charged or incurred by the Mortgage Creditor, such as property inspection fees, servicing fees or appraisal fees; (b) the nature of the expense or charge; and (c) the date of the payment.

B3.   As a result of a Mortgage Creditor's alleged non-compliance with this Addendum, the debtor may file a Motion for Order to Show Cause in compliance with Local Bankruptcy Rule 9020-1 no earlier than sixty days after the Mortgage Creditor's failure to comply with sections (A) or (B).   Before filing the motion, the debtor must make good faith attempts in writing to contact the Mortgage Creditor and to determine the cause of non-compliance, and must indicate in the Motion for Order to Show Cause the good faith steps taken, together with a summary description of any response provided by the Mortgage Creditor.

B4.   If a Mortgage Creditor's regular billing system can provide a statement to the debtor that substantially complies with this Addendum, but does not fully conform to all its requirements, the Mortgage Creditor may request that the debtor accept such statement.   If the debtor declines to accept the non-conforming statement, a Mortgage Creditor may file a motion, on notice to the debtor, the debtor's attorney and the chapter 13 trustee, seeking a declaration of the Court that cause exists to allow such non-conforming statements to satisfy the Mortgage Creditor's obligations under this Addendum.   For good cause shown, the Court may grant a waiver for purposes of this case and for either a limited or unlimited period of time.

                      The Joint Memorandum

The Joint Memorandum addressed and rejected two primary objections raised by the objecting mortgage creditors in the Herreras, Leffs and Hannon bankruptcy cases: (1) that the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"), preempts the field of regulations concerning information required to be provided to consumers in real estate transactions, such that the imposition of additional reporting requirements in a chapter 13 plan is prohibited; and (2) that the Addendum's reporting requirements each violate § 1322(b)(2)'s

restriction on modification of the mortgage creditors' contractual rights.

In overruling the mortgage creditors' objections, the Joint Memorandum acknowledged that RESPA requires lenders to make certain disclosures to consumers in connection with mortgage loans. The Joint Memorandum, however, found that nothing in RESPA prohibited the bankruptcy court, through plan confirmation, from requiring lenders to make additional information available to debtors in chapter 13 cases. In short, the bankruptcy courts held that while RESPA provides minimum reporting requirements for mortgage lenders, it does not conflict with RESPA for a chapter 13 plan to require additional account reporting.

As to the § 1322(b)(2) prohibition on contract modification, the bankruptcy judges held that a mortgage creditor's exercise of contractual rights was not without limits under chapter 13. The Joint Memorandum cited to several cases in other districts where the courts have approved plans containing additional reporting requirements. The judges noted that undisclosed post-petition charges assessed by mortgage creditors can potentially frustrate the goals of a chapter 13 debtor's plan, and prevent a debtor who successfully completes a plan from achieving the "fresh start" intended by the Bankruptcy Code. For these reasons, the Joint Memorandum concluded that the provisions in the Addendum imposing account reporting obligations on mortgage lenders during the term of a chapter 13 plan do not per se violate the anti-modification provision of § 1322(b)(2) and are permissible.

The Joint Memorandum (as well as the bankruptcy judge in the Monroys' case) did note, though, that the Addendum's subsection

-11-

A7, requiring that advance notice be given to a debtor of a creditor's intention to seek relief from the automatic stay, imposed an obligation on the creditor that was inconsistent with the express requirements of § 362(d) and at odds with the District's motion practice rules.  Therefore, the four bankruptcy courts ordered the exclusion of subsection A7 in any amended plan as a condition for confirmation.

## JURISDICTION

The bankruptcy courts had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L).  We have jurisdiction under 28 U.S.C. § 158.  However, because of the procedural approach taken by the mortgage creditors in the Herrera, Leff and Hannon appeals, we shall comment further about our jurisdiction.

First, we must consider the manner in which the mortgage creditors attempted to perfect their appeals.  In each of these cases, the original notice of appeal by the respective mortgage creditor was premature, having been filed after issuance of the April 28 Joint Memorandum, but prior to the debtors' amendment of their chapter 13 plans as prescribed in the Joint Memorandum, and the bankruptcy courts' entry of a final order confirming those amended plans.  In other words, at the time the original notices of appeal were filed, no final order had been entered from which the mortgage creditors could appeal.

Even so, since the plan amendments in these cases were accomplished merely to comply with the bankruptcy courts' orders, and the amended plans were confirmed shortly after they were filed, we think the creditors' original notices of appeal of the plan confirmations were effective, albeit early.  Rule 8002(a)

-12-

provides that a "notice of appeal filed after the announcement of a decision or order, but before entry of the judgment, order or decree, shall be treated as filed after such entry on the date thereof." Under these circumstances, we deem the original notices of appeal timely filed and effective.

We also decline to reject these appeals because the amended notices of appeal, filed after the amended plans were confirmed in these three cases, purported to appeal not from the confirmation orders but from the orders entered implementing the Joint Memorandum. In our view, the orders implementing and entered at the same time as the Joint Memorandum were clearly interlocutory, and merged into the confirmation orders thereafter entered in each case after the debtors' plans were amended. Any dispute the mortgage creditors have with the contents of the Joint Memorandum can be brought before us in our consideration of the four plan confirmations. In other words, we consider the amended notices of appeal to be superfluous.

The mortgage creditors, as appellants in the three cases covered by the Joint Memorandum, are not prejudiced by this decision. According to their statements of the issues on appeal, the creditors seek review of the Joint Memorandum's approval of the provisions in the Addendum incorporated in each plan, to which each creditor had objected. Their objections to those provisions are properly before us in the appeal of the confirmation orders. As explained in <u>Munoz v. Small Bus. Admin.</u>, 644 F.2d 1361, 1364 (9th Cir. 1981):

> [T]he rule is well settled that a mistake in designating the judgment appealed from [in a notice of appeal]

-13-

should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.  9 Moore's Federal Practice, para. 203.18, at 3-76-77 (2d ed. 1980).  Furthermore, an appeal from the final judgment draws in question all earlier non-final orders and all rulings which produced the judgment.  Id. at 3-80.  See also United States v. Walker, 601 F.2d 1051, 1058 (9th Cir. 1979).

Here, the mortgage creditors have always made clear in their submissions to the Panel that they challenge the ruling in the Joint Memorandum approving the Addendum's provisions and overruling their objections, which decision ultimately resulted in the confirmation of the three plans.  We therefore elect to overlook technical issues with the notices of appeal and consider the merits of these appeals.

A second procedural question is more problematic.  For relief in all four appeals, the mortgage creditors ask the Panel either to direct the bankruptcy judges of the Central District of California to ban the use of the Addendum, or to direct those judges to adopt a plan form that permits continuation of prepetition accounting statements and compliance with RESPA.  The creditors offer us no case law or statutory grounds to support this expansive view of the Panel's authority, and we know of no grounds for banning an optional form nor directing the District's bankruptcy judges to create a new one.  Instead, our statutory role is limited to review of discrete orders as an appellate tribunal.  See 28 U.S.C. § 158(a)(1), (2) (providing for appeals from final, or in some cases interlocutory, judgments, orders and decrees).  In this instance, the Panel's review is limited to the orders confirming the debtors' amended plans.  We decline the

-14-

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 15 of 43

mortgage creditors' invitation to do more.

However, again, we do not see how the creditors are prejudiced by our commitment to this restricted role. Were we to accept their arguments that incorporation of the provisions of the Addendum in these chapter 13 plans renders them unconfirmable as a matter of law, the bankruptcy judges of the Central District of California might well decide to abolish or modify this form. That we decline to direct the District's bankruptcy judges to "ban" or redraft its form does not mean that the mortgage creditors will not have had a full and fair opportunity to challenge the Addendum's provisions before the Panel.[11]

## ISSUES

1. Whether inclusion of the provisions of the Addendum in the debtors' confirmed chapter 13 plans is inconsistent with the terms of RESPA, or violates separation of powers.

2. Whether the provisions of the Addendum incorporated in the debtors' confirmed plans impermissibly modify the mortgage creditors' rights in violation of § 1322(b)(2).

---

[11] As noted above, in their briefs, the mortgage creditors also seek a decision from the Panel condemning the provisions of subsection A7. However, all four bankruptcy judges refused to endorse subsection A7 and they ordered that it be omitted from the debtors' amended plans. Since subsection A7 was deleted from all four plans before us on appeal, there is no active controversy before us concerning this provision. Of course, this Panel may only address actual cases and controversies. Tennant v. Rojas (In re Tennant), 318 B.R. 860, 866-67 (9th Cir. BAP 2004). As the Ninth Circuit cautions, "Article III requires that a live controversy persist throughout all stages of the litigation. Where this condition is not met, the case [or issue] has become moot, and its resolution is no longer within our constitutional purview." Gator.com Corp. v. L.L. Bean, Inc., 398 F.3d 1125, 1128-29 (9th Cir. 2005) (citation omitted). We therefore express no opinion concerning subsection A7, nor the propriety of any other provision of the Addendum not properly challenged in this appeal.

**STANDARD OF REVIEW**

There are no issues of fact raised in these appeals.  We review issues of federal statutory construction, including interpretation of provisions of the Bankruptcy Code, de novo. Einstein/Noah Bagel Corp. v. Smith (In re BCE W., L.P.), 319 F.3d 1166, 1170 (9th Cir. 2003); Mendez v. Salven (In re Mendez), 367 B.R. 109, 113 (9th Cir. BAP 2007).

**DISCUSSION**

I.    **Inclusion of the challenged Addendum provisions in the debtors' confirmed plans does not conflict with RESPA.**

A.

The mortgage creditors argue that Congress intended that RESPA occupy the field requiring reports from mortgage creditors to debtors regarding loans on primary residences, to the exclusion of the states and other branches of the federal government, including the courts.  In their view,

> RESPA's scheme is so pervasive as to make reasonable the inference that Congress has neither left room for the states, nor other branches of the Federal Government, to supplement it: Local Form F 3015-1:1A not only duplicates RESPA but is fatally inconsistent with the federal statute. . . . By enacting RESPA, Congress has acted to occupy the scope of the field in regards to real estate disclosures and a reasonable expectation is thus created that other Federal branches will not impose duplicative or inconsistent reporting requirements in violation of Bankruptcy Rule 9029(a)(1).  §§ (A)(4), (A)(5) and (A)(6) of Local Form F 3015-1.1A usurp Congress' authority by legislating and mandating reporting requirements that not only duplicate Federal Law but are inconsistent, and more burdensome, than those created by RESPA.

Appellants' Open. Br. at 20-22.

It is the creditors' position that RESPA effectively prevents chapter 13 debtors from including provisions in their proposed

-16-

debt-repayment plans increasing a mortgage creditor's obligation to provide account status reports and other information to the debtor or trustee during the term of the plan. Unfortunately, the mortgage creditors make their conclusory arguments without reference to the particular provisions of RESPA that they allege are violated by the plan provisions, nor do they cite to relevant case law interpreting RESPA in such fashion.

As discussed below, we conclude that the creditors' argument is neither supported by the plain language of RESPA nor was it the clear intent of Congress in enacting RESPA that chapter 13 debtors be prohibited from proposing enhanced mortgage account reports in their plans.

B.

Only a brief comment is required to dispatch the mortgage creditors' concerns that inclusion of the offensive provisions in the debtors' confirmed chapter 13 plans somehow violates the doctrine of separation of powers. They apparently contend that when a majority of the Central District's bankruptcy judges approved an optional local form containing provisions that could be included in the District's chapter 13 plans, several of which provisions creditors contend run afoul of RESPA, those judges somehow usurped the prerogative of Congress to enact laws regulating residential mortgages.

The mortgage creditors' argument is a non-starter because it ignores the bankruptcy judges' decision to make use of the Addendum optional, such that the incorporation of its provisions in debtors' plans was subject to review by bankruptcy courts on a case-by-case basis. Indeed, the instructions on Local Form

-17-

3015.1.1A state that "[a] chapter 13 debtor <u>may</u> attach this addendum to his/her chapter 13 plan." This a not a situation where the local bankruptcy court has, through a local rule or general order, mandated the terms of a debtor's proposed plan and treatment of a creditor's claim. As a result, the propriety of the plan provisions arising from incorporation of the Addendum into the debtors' plans was freely subject to challenge in each of these cases, and the mortgage creditors' argument that the bankruptcy courts somehow violated the separation of powers doctrine misses the point.

C.

A variation of the creditors' separation of powers argument is that the provisions of the Addendum directly conflict with the intent of Congress that RESPA be the exclusive regulatory authority governing reporting requirements imposed on mortgage creditors to borrowers on their primary residence. We disagree with this assertion.

In addition to mandatory plan provisions, § 1322(b)(11)[12] provides that a chapter 13 debtor's plan may "include any other provision not inconsistent with [title 11]." This grant gives debtors considerable discretion to tailor the terms of a plan to their individual circumstances. Bankruptcy courts have endorsed a broad range of provisions under § 1322(b)(11).[13] Besides enhanced

---

[12] BAPCPA did not amend the substance of this Code provision, previously numbered § 1322(b)(10).

[13] As a leading treatise has observed about this provision,

"There are few limits in the Code on other possible plan provisions. For example, the debtor's payments into the plan may be varied to take into consideration seasonal

(continued...)

-18-

creditor account reporting requirements, other provisions approved by bankruptcy courts under § 1322(b)(11) include, for example: (1) authorizing the debtor to exercise a trustee's avoiding powers, Hearn v. Bank of New York (In re Hearn), 337 B.R. 603 (Bankr. E.D. Mich. 2006); (2) establishing reserve funds to pay utilities in event of default, In re Epling, 255 B.R. 549 (Bankr. S.D. Ohio 2000); (3) paying taxes in a particular order, In re Klaska, 152 B.R. 248 (Bankr. C.D. Ill. 1993).

Here, the mortgage creditors challenge the debtors' inclusion of the Addendum provisions in their plans, arguing that those provisions are in conflict with, and preempted by, RESPA. However, based upon our review of the purpose of RESPA, we fail to see any conflict with these plan provisions.

"The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute." United States v. Daas, 198 F.3d 1167, 1174 (9th Cir. 1999). "The first step in ascertaining congressional intent is to look to the plain language of the statute." Id. "The plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results." Id. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v.

[13](...continued)
income, as long as the plan is feasible. The plan may provide for a temporary moratorium on certain types of payments; or it may delay the vesting of property until some time after confirmation. [It may even] include a provision providing for injunctive or equitable relief."
8 COLLIER ON BANKRUPTCY ¶ 1322.14[4] at 1322-56 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev., 2007) (footnotes omitted).

Cartier, Inc., 486 U.S. 281, 291 (1988) (quoted in Nadarajah v. Gonzales, 443 F.3d 1069, 1076 (9th Cir. 2006)).

While divining the intent of Congress in enacting a statute can be a daunting task for courts, RESPA is that fortunate statute in which the plain meaning and Congress's intent are one and the same. The introductory sections of RESPA express in unambiguous terms Congress's intent that RESPA be viewed as a consumer protection statute promoting the flow of "greater and more timely information" between mortgage creditors and debtors:

> The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.

12 U.S.C. § 2601(a).

> It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result — (1) in more effective advance disclosure to home buyers and sellers of settlement costs[.]

12 U.S.C. § 2601(b)(1).

Although the "settlement process" referred to in RESPA at the time of its enactment in 1974 was restricted to the procedures culminating in the execution of the mortgage contract, Congress expanded the scope of the statute in 1990 to include servicing of mortgage loans during the term of the contract:

> The term "servicing" means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 10 [12 U.S.C. § 2609], and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

-20-

12 U.S.C. § 2605(i)(3), added Nov. 28, 1990, P.L. 101-625, Title IX, Subtitle C, § 941, 104 Stat. 4405.

Courts analyzing this statute have found that "Congress intended RESPA to be a remedial consumer-protection statute" and that the statute is therefore "construed liberally in order to best serve Congress' intent." Rawlings v. Dovenmeuhle Mortg., Inc., 64 F.Supp.2d 1156, 1165 (M.D. Fla. 1999); Thorian v. Baro Enters., LLC (In re Thorian), 387 B.R. 50, 68-69 (Bankr. D. Idaho 2008); accord Ellis v. Gen. Motors Acceptance Corp., 160 F.3d 703, 707 (11th Cir. 1998) (holding that remedial consumer protection statutes are to be construed liberally). We agree that, simply put, Congress intended RESPA to promote full and timely exchange of information between mortgage creditors and borrowers to combat "unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a).

This congressional intent does not conflict, but instead is consistent, with the rationale expressed in the Joint Memorandum for approving the inclusion of the Addendum provisions in the debtors' confirmed plans:

> . . . the Addendum seeks to address Chapter 13 issues, specifically the increasing problem of undisclosed and sometimes questionable post-petition mortgage charges assessed by lenders during the course of a chapter 13 proceeding, which are neither addressed nor remedied by the provisions of RESPA.

Joint Memorandum at 2. Consistent with RESPA, as discussed above, the purpose for the creation and approval of the Addendum provisions by the Central District's bankruptcy judges was to be one means of "preventing a secured creditor from springing

additional fees and costs on the debtor at the conclusion of the bankruptcy case that had not been communicated to the debtor or approved by the court." In re Bracks, Hr'g Tr. 5:21-6:4 (August 4, 2008).

The plain language of RESPA not only supports a finding that RESPA is consistent with the Addendum provisions, but also explicitly disproves the mortgage creditors' argument that Congress intended that RESPA "occupy the field" when it comes to the mortgage creditor's obligations to provide reports to debtors to the exclusion of other law, state or federal. Indeed, RESPA requires, for example, that where state law provides greater consumer protection to debtors regarding mortgages on their principal residence, state law prevails:

> This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency. The Secretary is authorized to determine whether such inconsistencies exist. The Secretary [of HUD] may not determine that any State law is inconsistent with any provision of this chapter if the Secretary determines that such law gives greater protection to the consumer. In making these determinations, the Secretary shall consult with the appropriate Federal agencies.

12 U.S.C. § 2616 (emphasis added).

Likewise, RESPA cannot be seen to occupy the field of mortgage creditor reports to debtors to the exclusion of other federal laws. One such law, the Truth in Lending Act ("TILA"), imposes greater, potentially more intrusive and administratively burdensome reporting requirements on mortgage creditors than does RESPA. One provision of TILA empowers the Board of Governors of

-22-

Case: 09-1175 Document: 009137956 Filed: 01/15/2010 Page: 23 of 43

the Federal Reserve System (the "Board") to "prohibit acts or practices in connection with — (A) mortgage loans that the Board finds to be unfair, deceptive, or designed to evade the provisions of this section[.]" 15 U.S.C. § 1639(l)(2)(A). In 2008, exercising its TILA authority, the Board expressed concern about deceptive practices in the servicing of home mortgages.

> The Board shares concerns about abusive servicing practices. Before securitization became commonplace, a lending institution would often act as both originator and collector — that is, it would service its own loans. Today, however, separate servicing companies play a key role: they are chiefly responsible for account maintenance activities, including collecting payments (and remitting amounts due to investors), handling interest rate adjustments, and managing delinquencies or foreclosures. Servicers also act as the primary point of contact for consumers. . . .
>
> A potential consequence . . . is the misalignment of incentives between consumers, servicers, and investors. Servicers contract directly with investors, and consumers are not a party to the contract. The investor is principally concerned with maximizing returns on the mortgage loans. So long as returns are maximized, the investor may be indifferent to the fees the servicer charges the borrower. Consumers do not have the ability to shop for servicers and have no ability to change servicers (without refinancing). As a result, servicers do not compete in any direct sense for consumers. Thus, there may not be sufficient market pressure on servicers to ensure competitive practices. . . . [S]ervicers may not timely credit, or may misapply, payments, resulting in improper late fees. Even where the first late fee is properly assessed, servicers may apply future payments to the late fee first, making it appear future payments are delinquent even though they are, in fact, paid in full within the required time period, and permitting the servicer to charge additional late fees — a practice commonly referred to as "pyramiding" of late fees. The Board is also concerned about the transparency of servicer fees and charges, especially because consumers may have no notices of such charges prior to their assessment. Consumers may be faced with charges that are confusing, excessive, or cannot easily be linked to a particular service. In addition, servicers may fail to provide payoff statements in a timely fashion, thus impeding consumers from refinancing existing loans.

73 FED. REG. 1672, 1702 (January 9, 2008). To remedy these abuses,

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 24 of 43

the Board proposed a new regulation prohibiting a loan servicer "from failing to provide, within a reasonable time after receiving a request from a consumer or any person acting on behalf of the consumer, an accurate statement of the full amount required to pay the obligation in full as of a specified date." Id. at 1703.

The Board published the Final Rule and Official Commentary on July 30, 2008. 73 FED. REG. 44522 (July 30, 2008). The Official Commentary acknowledged that the regulation was applicable in bankruptcy proceedings, and further stated that "reasonable time" in most cases would be five days to provide the information. Id. at 44573. The Official Commentary noted that the five-day deadline for providing the information was supported by national lenders, who argued during the comment period that the originally proposed three-day period for providing the requested report was not reasonable but that five days would be sufficient. Id.

As authorized by TILA, on October 1, 2009, new 12 C.F.R. § 226.36(c)(1)(iii) went into effect (also known as part of "Regulation Z")[14]:

> (c) Servicing practices. (1) In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall. . . — (iii) Fail to provide, within a reasonable time after receiving a request from the consumer or any person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to satisfy the consumer's obligation in full as of a specified date.

As can be clearly seen, then, RESPA was not intended by Congress to occupy the field of account reporting by creditors to

---

[14] The Federal Reserve Board of Governors was authorized to promulgate Regulation Z under 15 U.S.C. § 1604 (a). The information collection requirements were approved by the Office of Management and Budget under 44 U.S.C. § 3501 et seq. and were assigned OMB number 7100-0199.

-24-

borrowers regarding their residential mortgage loans to the exclusion of all other federal law. Regulation Z, enacted pursuant to TILA, and available to bankruptcy debtors, provides a substantially more intrusive reporting requirement on mortgage creditors than RESPA's requirements.

RESPA imposes two significant reporting requirements on mortgage lenders or loan servicers. Under 12 U.S.C. § 2609(c)(2), RESPA requires an annual report be made to debtors regarding details of escrow accounts maintained by the servicer. Under 12 U.S.C. § 2605(e)(1), the servicer must provide on written request information demanded by the debtor within 60 days. Regulation Z requires the servicer to provide a final payout report, which would require the servicer to have access to information on all costs and balances, not only those specified by the Addendum, and to provide that payout report on five days' notice.

There is nothing in RESPA that leads us to believe that the reporting duties it imposes on creditors were intended to exclude other laws or regulations. Moreover, in our view, the new federal regulation casts doubt on the mortgage creditors' argument that the Addendum is unduly burdensome, by forcing them

> to bear unanticipated administrative and systematic costs of collecting, correctly monitoring for and differentiating pre-petition and post-petition payments, late charges and escrow balances on a monthly basis. Mandating that Appellants must develop a new system in order to abide by a local form clearly abridges Appellants' substantive rights.

Appellants' Opening Br. at 16.

Although the mortgage creditors insist that the Addendum's reporting requirements are unduly burdensome and expensive, they provided no evidence to the bankruptcy court (or to this Panel) to

-25-

demonstrate the extent of the alleged burden of complying with the Addendum on a monthly or quarterly basis.  In response to repeated questions at oral argument, counsel for the mortgage creditors acknowledged that no such information was presented to the bankruptcy courts.[15]

Contrary to the mortgage creditors' view, Regulation Z requires a mortgage creditor to be prepared to produce a payout report, which necessarily includes information about all costs and expenses related to the mortgage contract, on only five days' notice.  Although there may well be some expense to provide the detailed reports required by the Addendum, in the absence of any evidence from the mortgage creditors as to the extent of that expense and its corresponding burden, especially in light of Regulation Z's requirement that a payout report be available on five days' notice, we decline to simply assume that the Addendum provisions adversely impact the mortgage creditors' substantive rights.

We conclude that the mortgage creditors' argument that RESPA occupies the field of reports required by mortgage creditors such that chapter 13 debtors are precluded from crafting additional reporting rules in their chapter 13 plans lacks merit and is directly contradicted by the plain language of RESPA.  As stated

---

[15]  At argument before the Panel, after admitting that Appellants had no evidence on the burden and expense of the reporting requirements, the mortgage creditors' counsel asked the Panel to take "judicial notice" that implementation of changes in accounting procedures to comply with the Addendum would be expensive.  The Panel declines this request because it assumes a fact that is subject to reasonable dispute and that it is neither generally known nor capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. See Fed. R. Evid. 201(b).

-26-

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 27 of 43

in the Joint Memorandum, RESPA provides a floor, a minimum set of disclosures required of mortgage creditors to borrowers.  The Addendum seeks to address chapter 13 issues which are neither addressed nor remedied by the reporting provisions of RESPA. Specifically, the debtors and the court need to know the amount of default so as to implement § 1322(b)(5), which provides that

> [n]otwithstanding paragraph (2) of this subsection, [the plan may] provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

The bankruptcy court and debtors need the information targeted by the Addendum to implement § 1322(b)(5), and are hampered in that task by, as the Joint Memorandum describes it, "the increasing problem of undisclosed and sometimes questionable post-petition mortgage charges assessed by lenders during the course of a chapter 13 proceeding."  Indeed, even the Federal Reserve Board recognized the inadequacy of RESPA in its comments proposing the imposition of additional, and more intrusive, reporting requirements on mortgage servicers for their "abusive practices."

II.   **The provisions of the Addendum incorporated in the debtors' confirmed plans do not violate § 1322(b)(2).**

A.

The mortgage creditors argue that the Addendum's subsections A2, A4, and A5 "ignore [the mortgage creditors'] contractual rights by modifying the terms of the Deed of Trust and Note in violation of § 1322(b)(2)."  Appellants' Open. Br. at 15.  This provision of the Code instructs that a chapter 13 plan may,

> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real

-27-

property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

11 U.S.C. § 1322(b)(2) (emphasis added). As can be seen, the Code bans the modification of a mortgage creditor's "rights." As a result, there is a potential ambiguity in the statute relating to the meaning ascribed to that term.

Ostensibly, the word "rights" has a plain meaning. For example, leading treatises on contract law define a right under contract law as the correlate of a duty.

When we say that one party has a "right" to performance which the other party has a duty to render, we mean that our organized society of people commands one party's performance for the benefit of the other party, and provides some remedy in accordance with a stated procedure in case of non-performance. This is the "legal relation" of right and duty.

8 CORBIN ON CONTRACTS § 30.4 at 4 (Joseph M. Perillo, ed., rev. ed. 1999). See also E. Allen Farnsworth, CONTRACTS § 3.4 at 114 n.3 (Foundation Press 3d ed. 1999) ("Right and duty are therefore correlatives, since in this sense there can never be a duty without a right.").

California law also distinguishes between contractual rights and duties. Cal. Code Civ. Proc. § 1060 (Declaratory Relief: Any person interested under a . . . contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties . . . ask for a declaration of rights or duties . . . . and the court may make a determination of these rights or duties").

Counsel for the mortgage creditors was repeatedly asked at oral argument before the Panel to identify which "rights" under the mortgage instruments that the challenged Addendum provisions

-28-

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 29 of 43

impermissibly modify.  Counsel cited to Covenants 9 and 14 in the deeds of trust.  Covenant 9 provides:

> Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that may significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien that has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligations to do so; it is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.
> 
> Any amount disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Read fairly, this covenant purportedly grants a mortgage creditor rights designed to protect its security interest.  In particular, it provides that additional disbursements made by the creditor become part of the secured debt which must be repaid by the debtor.

However, there is nothing in the Addendum that limits or

modifies these rights.  A mortgage creditor may, if necessary, make protective disbursements after confirmation of a plan.  For example, if a chapter 13 debtor fails to make current payments, the mortgage creditor may be required to advance payment for property taxes.  The creditor may also be compelled to seek relief from the stay to enforce the mortgage.  If these occur, this covenant provides that the tax payments and its reasonable attorneys fees thus incurred be reimbursed by the debtor.  Under questioning by the Panel, counsel for the mortgage creditors conceded that the creditors' right to seek recovery of all post-petition charges under this covenant was not impacted by the debtors' confirmed plans or the Addendum provisions.[16]

More significantly, our own review of the mortgage instruments in all four bankruptcy cases confirms there is no provision that grants the creditors a "right" to decline to provide accountings and reports to the debtors or a trustee beyond those prescribed by the mortgage contracts, or any sort of bargained for prohibition on modification of duties under the contract.  On the other hand, the contracts do acknowledge that RESPA imposes duties on the creditors to provide account reports. We therefore conclude that, while the mortgage creditors' contracts impose a duty upon them concerning account reporting, it is not a right, and consequently, § 1322(b)(2)'s anti-modification provision is not applicable in this dispute.

In their briefs, the mortgage creditors appear to argue that

---

[16] Covenant 14 likewise purportedly grants the mortgage creditors certain rights to charge debtors for services performed in the event of debtors' default.  Again, we find nothing in the Addendum that in any way limits or modifies those rights.

-30-

they have a right under California law not to have their duties modified. In their only citation to authority for this argument, the mortgage creditors rely upon the California Supreme Court's decision in Dreyfuss v. Union Bank of Cal., 11 P.3d 383 (Cal. 2000). The creditors assert that, in this decision, the court concluded that the California legislature's enactment of anti-deficiency legislation was evidence that the California legislature had addressed the relative burdens of a mortgage creditor and debtor and intended that the burdens of the mortgage creditor not be modified.

Dreyfuss does not stand for the proposition that a mortgage creditor has a right under state law not to have its duties modified. In Dreyfuss, a borrower defaulted on a loan secured by separate deeds of trust on three real estate parcels. The mortgage creditor conducted a nonjudicial foreclosure sale on one property, and then proceeded with serial foreclosure sales of the remaining properties. The borrowers argued on appeal that foreclosing on the second and third properties without a judicial determination of the fair market value of the first property, and crediting that amount to the secured debt, was "the functional equivalent of a deficiency judgment" in violation of Cal. Code Civ. Proc. §§ 580a and 580d.[17]

---

[17] Cal. Code Civ. Proc. § 580a, in pertinent part, provides: "Whenever a money judgment is sought for the balance due upon an obligation for the payment of which a deed of trust or mortgage with power of sale upon real property . . . was given as security, following the exercise of the power of sale in such deed of trust or mortgage, the plaintiff shall set forth in his or her complaint the entire amount of the indebtedness which was secured by the deed of trust or mortgage at the time of sale, the amount for which the real property or interest therein was sold and the fair market value thereof at the date of sale and the date of that sale. . . . Before rendering any judgment the court shall find the fair market value of the real property . . . sold, at the time of

(continued...)

The *Dreyfuss* court rejected the borrower's argument, finding that the California code provisions were irrelevant, and that a mortgage creditor may proceed seriatim in foreclosing against multiple items of collateral without intervening judicial actions. 11 P.3d at 386.  In other words, *Dreyfuss* deals with the relationship between mortgage creditor and borrower _following a foreclosure._  Discussing that relationship, the state supreme court commented,

> The nonjudicial foreclosure provisions evince the legislative intent to establish an equitable trade-off of protections and limitations affecting the defaulting borrower and his or her creditor.  In a nonjudicial foreclosure, the borrower is protected, inter alia, by notice requirements and a right to postpone the sale, in order to avoid foreclosure either by redeeming the property from the lien before the sale or finding another [] purchaser. . . .  For its part, the creditor gains the certainty of a "quick, inexpensive and efficient remedy."

*Id.* at 390 (emphasis added).  This is the only reference in *Dreyfuss* to legislative intent and clearly refers to the trade-off of protections and limitations _following a foreclosure_.  Nothing in *Dreyfuss* or any California law argued to this Panel supports an argument that the California legislature intended as either law or public policy that a mortgage creditor's burdens _outside_ the foreclosure process should not be modified.[18]

---

[17](...continued)
sale."
    Cal. Code Civ. Proc. § 580d, in pertinent part, provides: "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property or an estate for years therein hereafter executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust."

[18]  The mortgage creditors apparently recognize that *Dreyfuss* only concerns the relationship of mortgage creditor and borrower in a foreclosure.  Their summary argument on this point in their
(continued...)

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 33 of 43

In the four cases before us, we cannot discern whether the mortgage loans were in the process of being foreclosed when the debtors chapter 13 petitions were filed. We are confident, though, that even if the foreclosure process had commenced, it had certainly not been completed. Consequently, there was no theoretical transformation in the relationship of debtor and creditor, and the mortgage creditor did not acquire some alleged right not to have its burdens modified.

Even if by some creative route we could transform the mortgage creditors' contractual and statutory duty to provide reports into a "right" not to have those duties modified, we conclude it is not the sort of right that Congress intended to protect under § 1322(b)(2). Courts that have examined the meaning of modification of rights of mortgage creditors in bankruptcy have held that only a mortgage creditor's rights to payment are protected from modification under § 1322(b)(2). Grubbs v. Houston First Am. Sav. Ass'n, 730 F.2d 236, 246-47 (5th Cir. 1984)(en banc)(holding that § 1322(b)(2) was only intended to ensure that a plan preserved the size and periodicity of the monthly payments originally contemplated under the terms of the debt); In re Larkins, 50 B.R. 984, 986 (W.D. Ky. 1985) ("'Modify' [in

---

[18](...continued)
opening brief states, "The legislature has clearly considered the burdens imposed upon secured creditors to balance them with the borrower's rights in order to find the statutes equitable. The entire Local Form F 3015-1.1A conflicts with California law by shifting additional burdens contrary to Appellants' state rights and contract rights and should be stricken." Appellants' Op. Br. at 23 (emphasis added). The statutes Appellants refer to here are Cal. Code Civ. Proc. §§ 580a and 580d, which only refer to foreclosures. And as the California Supreme Court cautions in Dreyfuss, "both provisions [§§ 508a and 508d] apply only when a personal judgment is sought against the debtor after a foreclosure." Id. at 387.

§ 1322(b)(2)] means to change the amount of the debt."); Capital Resources Corp. v. McSorley (In re McSorley), 24 B.R. 795, 798 (Bankr. D.N.J. 1982) ("There is no modification of a creditor's claim if he is receiving 100% of what he is due plus accruing interest up until the time of payment.").

More recently, the Fourth Circuit examined the meaning of "modification" in § 1322(b)(2) and ruled that this proscription only applied to "fundamental" aspects of a claim, i.e., the payment terms. As the Fourth Circuit explained:

> The bankruptcy courts have consistently interpreted the nomodification provision of § 1322(b)(2) to prohibit any fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note. See, e.g., In re Schum, 112 B.R. 159, 161-62 (Bankr. N.D. Tex. 1990) (concluding that plan was impermissible modification because it proposed to reduce monthly payments and secured valuation). In In re Gwinn, 34 B.R. 936, 944-45 (Bankr. S.D. Ohio 1983), the court approved a plan as a permissible cure under § 1322(b)(5), because the plan did not propose to lower monthly payments, extend the repayment period, or make the obligation conditional. It instead sought only to reinstate the original contract with a minor delay in payment. Id.; see also In re Cooper, 98 B.R. 294 (Bankr. W.D. Mich. 1989) (finding impermissible modification where plan proposed new payment schedule). Along similar lines, another bankruptcy court concluded that confirmation of a Chapter 13 plan would have constituted an impermissible modification because the plan proposed to alter fundamental aspects of the debtor's obligations, i.e., the nature and rate of interest, and the maturity features of the loan. In re Coffey, 52 B.R. 54, 55 (Bankr. D.N.H. 1985). As these decisions have emphasized, § 1322(b)( 2) prohibits modifications that would alter at least one fundamental aspect of a claim.

Litton v. Wachovia Bank (In re Litton), 330 F.3d 636, 643-44 (4th Cir. 2003) (emphasis added).

The approach taken in Grubbs and Litton appears consistent with the Supreme Court's analysis in Nobelman v. Am. Sav. Bank,

-34-

508 U.S. 324 (1993):

> The term "rights" is nowhere defined in the Bankruptcy Code. In the absence of a controlling federal rule, we generally assume that Congress has "left the determination of property rights in the assets of a bankrupt's estate to state law," since such "property interests are created and defined by state law." Butner v. United States, 440 U.S. 48, 54-55, 59 L.Ed.2d 136, 99 S.Ct. 914 (1979). See also Barnhill v. Johnson, 503 U.S. 393, 398, 118 L.Ed.2d 39, 112 S.Ct. 1386 (1992). Moreover, we have specifically recognized that "the justifications for application of state law are not limited to ownership interests," but "apply with equal force to security interests, including the interest of a mortgagee." Butner, supra, at 55. The bank's "rights," therefore, are reflected in the relevant mortgage instruments, which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure. . . . See Record 135-140 (deed of trust); id., at 147-151 (promissory note); Tex. Prop. Code Ann. §§ 51.002-51.005 (Supp. 1993). These are the rights that were "bargained for by the mortgagor and the mortgagee," Dewsnup v. Timm, 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), and are rights protected from modification by § 1322(b)(2).

Nobelman, 508 U.S. at 329-30 (emphasis added).

Nobelman states that the rights referenced in § 1322(b)(2) "include" the payment terms described in that opinion. We are aware that the Supreme Court teaches us that, "[i]n definitive provisions of statutes and other writings, 'include' is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration." Am. Sur. Co. v. Marotta, 287 U.S. 513, 517 (1933). To determine whether the Supreme Court meant "include without limitation" or "is limited to the following" in its Nobelman decision, we look to the context. Id.

At the end of the quoted material from Nobelman, the Supreme Court provides an explanation for the list, stating that "these are the rights that were 'bargained for by the mortgagor and the mortgagee,' Dewsnup v. Timm, 502 U.S. 410, 417 (1992), and are rights protected from modification by § 1322(b)(2)." The Supreme Court links the rights protected from modification to those rights bargained for by the mortgagor and the mortgagee. In other words, only those rights that were "bargained for" by the mortgage creditors are protected from modification by § 1322(b)(2).

There is no indication in the record that the reporting provisions in the mortgage instruments were ever specifically bargained for. Indeed, California law recognizes that mortgage deeds of trust (the documents which here include the covenants) are generally adhesion contracts. Fischer v. First Int'l Bank, 109 Cal. App. 4th 1433, 1446 (Cal. Ct. App. 2003) ("Standardized deeds of trust are contracts of adhesion.").

Moreover, the explicit language of Covenant 3 of the mortgage instruments indicates that, not only were the notice provisions not bargained for, they were imposed by external law, RESPA. The mortgage creditors strongly argue that changing the annual reporting requirements in the mortgage instruments to a quarterly or monthly basis somehow modifies their rights under the instrument. But Covenant 3 provides, in part,

> Lender shall give to Borrower, without charge, an annual accounting of the [escrow] funds as required by RESPA. If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for excess funds in accordance with RESPA. If there is a shortage of funds in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA . . . . If there is a deficiency of Funds held in escrow, as

-36-

defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA.

(Emphasis added).

In short, the principal reporting requirement[19] in the mortgage instruments was not a bargained for element of the contracts.  It was imposed on the parties to the contract by federal law.  It neither added, enlarged nor reduced the respective rights and duties bargained for by the parties to the contract and, in fact, neither party had the power to change the annual reporting provision.

As explained by the Supreme Court and courts of appeal, the mortgage creditors' rights protected by § 1322(b)(2) all deal with the terms of payment of, the security for, and the ability to enforce the mortgage loan contracts.  We find nothing in the case law that compels the conclusion that enhanced reporting duties by mortgage lenders in chapter 13 cases are barred by the anti-modification provision of § 1322(b)(2).  Indeed, there is ample case law that supports an opposite position.

In Ameriquest Mortg. Co. v. Nosek (In re Nosek), 544 F.3d 34 (1st Cir. 2008), the First Circuit admonished the bankruptcy court for failing to require additional accounting and reporting by the creditor and that such additional reporting would not have been a

---

[19]  There are other minor notice provisions in the mortgage instruments, such as the requirement in Covenant 15 that there be only one address for the borrower to which the mortgage creditor sends notices.  As with the principal annual notice requirement, there is no evidence that this was a bargained for provision.  And as we have discussed elsewhere, Appellants have admitted that they have provided no evidence to the bankruptcy court or this Panel demonstrating how this or any notice provision is burdensome.

Case: 09-1175 Document: 009137956 Filed: 01/15/2010 Page: 38 of 43

prohibited modification under § 1322(b)(2):

> [E]ven if the Payment History could somehow be construed as a threat to her right to cure, the proper response of the bankruptcy court would have been an amendment to the Plan specifying the accounting practices necessary to eliminate that threat. See In re Watson, 384 B.R. 697, 705 (Bankr. D. Del. 2008) (holding that Chapter 13 plans "containing procedures for timely notice of fees and charges, proper allocation of payments and adjudication by [the bankruptcy court] of disputes over assessed fees, costs and charges under a mortgage may be confirmed without running afoul of section 1322(b)(2)); see also In re Collins, No. 07-30454, 2007 Bankr. LEXIS 2487, 2007 WL 2116416, at *11 (Bankr. E.D. Tenn. July 19, 2007) ("[L]anguage in a Chapter 13 plan burdening mortgagees with procedural obligations over the life of the plan does not, per se, violate § 1322(b)(2)'s anti-modification provision and is permissible and even desirable."). Only with such an Amendment in place would the Plan support the imposition of remedies pursuant to § 105(a) if Ameriquest failed to comply with its terms. Absent that specificity, the court had no authority to order the award it did.

544 F.3d at 48-49.

The mortgage creditors cite to <u>Nosek</u> for support of their position that a bankruptcy court should not require the mortgage creditor to change its accounting practices:

> In saying that the Plan would have to be amended to prescribe the accounting practices necessary to protect Nosek's right to cure before Ameriquest could be sanctioned for a violation of an order of the bankruptcy court, we do not suggest that the bankruptcy court should have engaged in a company-wide revision of Ameriquest's corporate accounting practices. Under the facts of this case, a simple amendment to the Plan clarifying how Ameriquest must account for short, late, or missed pre- and post-petition payments from Nosek or the trustee during the course of the repayment period would have sufficed.

In re Nosek, 544 F.3d at 50 n.16. The mortgage creditors are correct that the First Circuit cautioned that its position was not a license to the bankruptcy courts to require a mortgage creditor to implement company-wide revised accounting procedures. The

-38-

Case: 09-1175   Document: 009137956   Filed: 01/15/2010   Page: 39 of 43

court, however, clearly would allow the bankruptcy court to require that mortgage creditors generate information beyond what they are obliged to keep or report by the mortgage instruments and that such enhanced reporting requirements do not violate § 1322(b)(2).[20]

Several bankruptcy courts have also approved enhanced creditor account reporting requirements, rejecting the creditors' contention that such provisions violated § 1322(b)(2). For example, in In re Wilson, 321 B.R. 222 (Bankr. N.D. Ill. 2005), the debtor proposed a model plan which the Northern District of Illinois requires to be used by all chapter 13 debtors. The model plan contained a provision requiring the objecting mortgage lender to provide an itemized notice to the debtor of any outstanding payment obligations, and outlined a procedure for resolving any disputes over the amounts listed in the notice. The mortgage creditor argued that this plan provision constituted a prohibited modification of its rights under the mortgage contract. The bankruptcy court rejected this argument, noting that "by providing a procedure for the parties to use to definitively ascertain what a debtor owes to this home lender, the Model Plan does not modify a mortgage holder's rights in violation of § 1322(b)(2)." Rather,

---

[20] The First Circuit's warning to the bankruptcy court not to engage in company-wide revisions of a mortgage creditor's accounting system should be read literally — a praiseworthy caution against unnecessary meddling in a mortgage creditor's business practices. However, the mortgage creditors here have not shown either in the bankruptcy court or before the Panel that any substantial, company-wide modification of their accounting procedures would be required to comply with the Addendum. Moreover, even were that the case, subsection B4 of the Addendum provides the mortgage creditor with the opportunity to request a waiver of its requirements when in "good faith" the creditor, through its accounting system, cannot fully comply with the Addendum's reporting requirements.

the bankruptcy court explained, the model plan "merely provides a framework within which to enforce those rights according to the loan document terms." Id. at 225.

As discussed in In re Nosek, the bankruptcy court in In re Collins ruled that "language in a Chapter 13 plan burdening mortgagees with procedural obligations over the life of the plan does not, per se, violate § 1322(b)(2)'s anti-modification provision and is permissible and even desirable." 2007 WL 2116416 at *11. The Collins court endorsed reporting requirements beyond those required in the mortgage instruments, including notification

> to the trustee, the Debtors, and the attorney for the Debtors in writing of any changes in the interest rate for any non-fixed rate or any adjustable rate mortgages and the effective date of any such adjustment or adjustments not less than 60 days in advance of such change or at such time as the change becomes known to the holder if the change is to be implemented in less than 60 days [and] [t]o notify the trustee, the Debtors, and the attorney for the Debtors in writing of any change in the property taxes and/or the property insurance premiums that would either increase or reduce the escrow portion, if any, of the monthly mortgage payments and the effective date of any such adjustment or adjustments not less than 60 days in advance of such change or at such time as the change becomes known to the holder if the change is to be implemented in less than 60 days.

Id.[21]

In In re Watson, 384 B.R. 697, 705 (Bankr. D. Del. 2008), the

---

[21] Other bankruptcy courts have cited to or tracked the reasoning in In re Collins. See, In re Patton, 2008 WL 5130096 *4 (Bankr. E.D. Wisc. 2008) ("While there does not seem to be a concern with additional notice requirements, the plan should not impose affirmative duties upon creditors to protect their rights, which duties do not otherwise exist under the applicable contract, nor under state or federal law."); In re Hudak, 2008 WL 4850196 (Bankr. D. Colo. 2008) ("a change in notification, in this Court's opinion, does not substantively modify the rights of the Creditor any more than the filing of the bankruptcy itself."); In re Armstrong, 394 B.R. 794, 800 (Bankr. W.D. Pa. 2008); In re Emery, 387 B.R. 721, 724 (Bankr. E.D. Ky. 2008); but see In re Booth, 399 B.R. 316 (Bankr. E.D. Ark. 2009)(rejecting additional notice requirements as modification of rights under § 1322(b)(2).)

debtors proposed procedures for providing notice to the debtor of charges and fees assessed or accruing under a mortgage during the plan term.  Mortgage creditors opposed this under the anti-modification provision of § 1322(b)(2), insofar as the notice requirements differed from those provided in the mortgage contracts.  The bankruptcy court ruled that "plans containing procedures for timely notice of fees and charges . . . under a mortgage may be confirmed without running afoul of section 1322(b)(2)."  Id.

In In re Anderson, 382 B.R. 496 (Bankr. D. Ore. 2008), the bankruptcy court considered the application of its General Order requiring changes in some reporting requirements during a chapter 13 bankruptcy.  One particular provision was hotly contested.  The creditor's trust deed required that notice of changes in escrow accounts be sent to the debtor.  However, the chapter 13 plan provision changed this requirement to dictate that the debtor's attorney and the trustee also receive the notice.  The creditor challenged the provision on grounds that it was not required in the deed of trust.  The bankruptcy court ruled that "additional notice is more in the nature of a procedural requirement to aid Chapter 13 administration, than a modification and is therefore permissible."  Id. at 504.

Subsections A2, A4, A5 and A6 of the Addendum are all designed to provide necessary information concerning the status of, and any additional charges to, the debtors' mortgage loans during the term of their plan.  The basis for inclusion of such provisions in the plans is justified by the need for chapter 13 debtors to emerge from bankruptcy with their mortgage loans

-41-

current, a laudable goal which is completely consistent with the fresh start policies of the Code.  While mortgage loan account reporting requirements may be enhanced by these plan provisions, they do not modify any of the basic rights of the mortgage creditors.  A plan's inclusion of the enhanced reporting requirements is authorized by § 1322(b)(11), and such provisions do not violate § 1322(b)(2).

B.

The mortgage creditors' objections to inclusion of the provisions of subsections B3 and B4 of the Addendum in the debtors' plans are also without merit.

These two provisions impose no particular obligations on the mortgage creditors.  As the debtors point out, if the provisions of section A of the Addendum are appropriate, subsection B3 simply provides a procedure for enforcement of those provisions.  In other words, if a plan is confirmed that includes the subsection A reporting provisions, under subsection B3, a violation of those plan provision can be enforced via issuance of an order to show cause by the bankruptcy court.[22]  Moreover, subsection B3 provides a noncomplying creditor with significant due process rights before it can be found to have violated the plan, something that hardly amounts to a prohibited modification of any of its contract rights.

Similarly, subsection B4 does not modify a mortgage creditors' rights in violation of § 1322(b)(2).  If a mortgage

_____

[22]  The bankruptcy court could likely employ such a procedure to address alleged creditor violations of a confirmed plan even where the plan does not expressly so provide.  Subsection B3, in this sense, merely expressly incorporates such procedure as the required approach.

-42-

Case: 09-1175  Document: 009137956  Filed: 01/15/2010  Page: 43 of 43

creditor, for whatever good reason, is unable to comply with a reporting requirement, subsection B4 provides an optional opportunity for that creditor to avert any adverse consequences by requesting a waiver of the reporting requirements, beyond its initial opportunity to object to chapter 13 plan provisions prior to confirmation.  This option does not modify the mortgage creditors' rights in any respect.  If anything, it likely enhances their rights.

C.

None of the challenged provisions of the Addendum incorporated in the debtors' chapter 13 plans amount to prohibited modifications to the creditors' contractual rights in violation of § 1322(b)(2).  Enhancing the mortgage creditors' account reporting duties under subsections A2, A4, A5 and A6 of the Addendum does not impair any of their contractual rights, as that term is understood in this context.  The mortgage creditors provided no evidence in any of the bankruptcy courts or before this Panel that the additional reporting requirements create such an administrative burden as to jeopardize their fundamental contractual rights.

The provisions of subsections B3 and B4 also do not modify the creditors' rights - indeed, in some respects, these provisions provide additional rights and protections to them.

**CONCLUSION**

The mortgage creditors' challenges to the provisions of the Addendum incorporated in the debtors' confirmed chapter 13 plans lack merit.  We therefore AFFIRM the bankruptcy courts' orders confirming the plans.

-43-

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2011 Thomson Reuters.